**Lauren COOK, Plaintiff,**

v.

**Bruce BABBITT, Secretary of the Interior, Defendant.**

Civ. A. No. 91–0338 (RCL).

United States District Court, District of Columbia.

March 17, 1993.

Errata and Order, April 1, 1993.

Clint Bolick, Washington, DC, for plaintiff.

Sally Rider, Asst. U.S. Atty., Washington, DC, for defendant.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This cause comes before the Court on cross motions for summary judgment. The defendant is the Secretary of the Interior. As such, he is responsible for the actions of National Park Service (NPS) officials. *See* 16 U.S.C. sec. 1 (1988). The plaintiff, Lauren Cook, is a member of the 21st Georgia Volunteer Infantry, one of the private groups of Civil War history enthusiasts who, outfitted in meticulously reproduced period clothing and accoutrements, take to the field for simulated maneuver and combat in NPS-sponsored events held at national battlefield parks.[1] On February 14, 1991, she filed a complaint alleging that the administrators of Antietam and certain other parks[2] did not allow her to portray a male soldier in certain NPS events because she is a woman, thus denying her equal protection of the laws in contravention of the Fifth Amendment's Due Process Clause. Plaintiff prayed for declaratory and injunctive relief, as well as attorney's fees.[3] In particular, plaintiff asked the Court to order the Secretary of the Interior to amend the governing regulations to forbid NPS officials service-wide from using gender as a ground for discrimination in casting the dramatic roles called for by the scenarios they conceive. Plaintiff also seeks to have defendant officially reprimand the officials involved, and to have this Court enjoin the officials directly from retaliating against the 21st Georgia.

Because plaintiff's claim arises under the Federal Constitution, this Court has jurisdiction over the subject matter of this case. *See* 28 U.S.C. sec. 1331 (1988). The fact that defendant is an officer of the United States poses no obstacle to the exercise of this jurisdiction here, for in addition to nonstatutory theories of review, the Administrative Procedure Act, 5 U.S.C. secs. 702, 706(2)(B) (1988), waives the defense of sovereign immunity and empowers this Court to pass on the constitutionality of the agency action and provide the requested declaratory and injunctive relief.

Defendant flatly denies plaintiff's allegation of gender-based discrimination, arguing that the ground for any discrimination in deciding who is allowed to participate in the events is not gender, but historical accuracy. That is to say, the NPS officials did what they did not because of the immutable fact that plaintiff is a woman. They did so because plaintiff's costume was inaccurate in several respects, one of which was that she failed to disguise her gender effectively. De-

---

1. Plaintiff is now the Director of Development for Fayetteville State University in North Carolina. She was previously Director of Public Affairs and Development at George Mason Law School. Her volunteer activities are part-time, e.g., at weekend events.

2. Plaintiff's claims concerning these other parks are discussed *infra* Section VI.

3. Plaintiff also requested damages for lost compensation, but the employment discrimination theory seems to have been abandoned—along with the allegation that the NPS actions denied plaintiff due process of law.

fendant maintains that anyone who meets the gender-neutral accuracy standards of NPS–6, as implemented by the administrators at each park, can play whatever role they want irrespective of gender. Defendant makes no effort to justify, under *Craig v. Boren*, 429 U.S. 190, 197, 97 S.Ct. 451, 456, 50 L.Ed.2d 397 (1976), the use of gender as a proxy for an important aspect of historical authenticity in casting dramatic roles in public education programs. Rather, this case presents the question of whether the officials in fact used gender as a proxy.

On February 3, 1992, after extensive discovery, plaintiff moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. The government responded with a summary judgment motion of its own on February 18, 1992. The Court has examined the briefs and underlying materials put forward by the parties. After careful consideration, the Court has decided to deny defendant's motion and to grant plaintiff's motion.

## I.

### A.

The Volunteer in the Parks Act of 1969 (VPA), 16 U.S.C. sec. 18g (1988), authorizes the Secretary of the Interior to enlist "the services of [private] individuals without compensation as volunteers for É interpretive functions É in É areas administered by the Secretary through the National Park Service." Pursuant to this authority, the Park Service promulgated the Interpretation Guideline, NPS Regulation 6, Release 3 (NPS–6) to govern interpretive programs throughout the national park system. Generally speaking, the regulation directs park administrators to achieve the greatest degree of historical accuracy that is reasonably practicable. Because the regulation applies service-wide, it must encompass as many historical themes as there are parks. Accordingly, NPS–6 is a general guideline and vests the officials in the field with discretion in designing the interpretive program that is most appropriate for their park. This includes setting the precise degree of verisimilitude in appearance, clothing, and accoutrements that they will require.

### B.

There are three types of interpretive presentations outlined in NPS–6. Exactly what constitutes "[a]cceptable 'accuracy'" depends on which type of interpretive presentation is employed. NPS–6, *supra*, ch. 4, at 3. The first type of presentation is the Cultural Demonstration, which typically involves persons in traditional dress demonstrating the customs of some cultural group. *Id.* at 4. Examples would include a tribal dance performed by Native Americans. NPS–6 states a preference for the use of actual members of the cultural group in question, characterizing their presence as "a strong interpretive asset in promoting a sense of believability." *Id.* at 5.[4]

The second type of interpretive presentation is the Costumed Interpretation. The interpreter's function is simply to display the clothing of the day while lecturing to visitors about the history of the park and answering any questions they might have. Because the Costumed Interpreter is not pretending to be the person like whom he or she is dressed, concern for accuracy generally is limited to the clothing and the information conveyed to the visitors. Nevertheless, "[c]are must be exercised not to mislead the public or create historical inaccuracies in their minds." *Id.* So NPS–6 directs interpreters who are manifestly inaccurate in other respects—for example, a Caucasian dressed as Frederick Douglass or a generic Sioux warrior—to "clearly point[ ] [the inaccuracy] out to the public." *Id.*

The third type of interpretive presentation, Living History, involves "first-person roleplaying." It is this most ambitious form of interpretive presentation that is involved in

---

**4.** While plaintiff mounts no challenge to NPS–6 itself, it is worth noting that the regulation is not facially neutral with respect to the suspect characteristics of national origin and race. *See also* Nat'l Park Serv., Living History Guidelines Clarification at 2–3 (circulated June 10, 1983) (introduced as Alexander Depo. ex. 6) (park officials are to give "sensitive consideration[ ]" to actual members of the racial or ethnic group, their "knowledge[,] and concerns." "In some cases, it will be most appropriate to recruit a person who is a member of that group for the role.").

this case. Living History interpreters actually assume the identity of either particular or generic historical figures. In encounters with visitors, they act and speak as if they are living in the past. Accordingly, they employ the first-person when conveying historical information to visitors about the historical personage they are portraying. To the visitor, it is supposed to be as if a Matthew Brady photograph or a Gilbert Stuart painting has come to life. The purpose is to foster a greater public interest in and understanding of American history.

Unlike Costumed Interpreters, Living History interpreters whose impressions are inaccurate in some respect cannot caution visitors not to draw a false inference about the past without compromising the integrity of their performance and undermining the visitors' willing suspension of disbelief. Accordingly, in Living History demonstrations, the requisite historical "accuracy includes not only the knowledge base [of the interpreter], the reproduced clothing and objects involved but also the *clearly identifiable physical characteristics* (i.e., identifiable after costuming, makeup, etc.)" of the participant. *Id.* (emphasis added).

By way of illustration, NPS–6 would permit a burly, bearded male ranger leading a tour at the Women's Rights National Historical Monument to do a Costumed Interpretation of a suffragette if "staffing realities" so required, as long as he explained to the visitors that suffragettes were in fact women

and that he was merely displaying the clothing of the day. But if the NPS sponsored a volunteer Living History presentation of a suffragette march, a person with the same physical characteristics would meet the accuracy requirements of NPS–6 only if he had a very clever disguise indeed.

## II.

### A.

This case concerns Living History events held at Antietam and other national battlefield parks (NBPs).[5] The plaintiff, Lauren Cook, has portrayed a male soldier or fifer in fifteen such events between July 1989, when she took up this avocation, until sometime after November 1990, when she responded to defendant's first set of interrogatories. She is a devoted amateur and takes historical accuracy seriously. In putting together her outfit, she consulted military historians, conducted research on her own, and bore the expense of custom tailoring. Because women were not permitted in military ranks in mid-nineteenth century America,[6] plaintiff tries to disguise her gender using various costuming techniques. She concedes that it is legitimate for NPS officials to require volunteers to mask inaccurate physical characteristics, including gender, at the events they sponsor. Her complaint is that the officials at Antietam categorically bar women from military roles regardless of how well an individual woman can do the impression. Their re-

5. In addition to affidavits, depositions, answers to interrogatories submitted by both parties, and the documents introduced thereby, the Court has considered all other materials submitted without objection. *See Catrett v. Johns–Manville Sales Corp.*, 826 F.2d 33, 37 (D.C.Cir.1987), *cert. denied*, 484 U.S. 1066, 108 S.Ct. 1028, 98 L.Ed.2d 992 (1988).

6. While women were not permitted in military ranks, not all of the soldiers who fought in the Civil War were male. A few women were able to disguise their gender so effectively that they passed as men—a remarkable feat in view of the close quarters in which soldiers lived. *See Personnel Admin. of Mass. v. Feeney*, 442 U.S. 256, 268 & n. 18, 99 S.Ct. 2282, 2290 & n. 18, 60 L.Ed.2d 870 (1979) (citing scholarship documenting that women disguised as men have fought in every war in our nation's history). So, while not all Civil War soldiers were male, all

were *apparently* male. Plaintiff argues that because at least one female fought at Antietam, defendant's refusal to permit her to portray a male soldier, far from advancing the objective of historical accuracy, actually diminishes the historical accuracy of Antietam events. Defendant's exclusion of plaintiff, the argument goes, is a substantive departure from defendant's asserted fidelity to historical accuracy.

Plaintiff's argument must fail, however, because the actual gender of combatants is simply not relevant to the objective here, which is not accuracy for accuracy's sake, but the accuracy of the impression created in the minds of visitors. Thus, what matters is not whether the percentage of female interpreters in an event mirrors the historical percentage of disguised female combatants, but rather, whether all of the interpreters, whether male or female, appear to be male from a reasonable distance.

sponse—citing the fact that these events transpired when plaintiff had been doing Living History for only two months—was that plaintiff's impression was manifestly inaccurate in several respects, and that was what motivated their actions.

Seven of the fifteen events plaintiff attended were NPS-sponsored—two at Petersburg NBP, two at Gettysburg NBP, one at Appomattox Court House National History Park (NHP), a parade in Washington, D.C., and one, a Revolutionary War-era event, in St. Augustine, Florida. Pl's Resps. to Def's First Set of Interrogs. at 10–14. The remainder apparently were either purely private affairs or held under color of state law. While plaintiff has participated in seven NPS Living History events, she asserts that on four other occasions, NPS officials did not allow her to portray a male soldier: The August 19–20, 1989 and 1990 "Aftermath of the Battle" events at Antietam; the September 18, 1989 "Torchlight Tour" event at Antietam; and the October 20, 1989 Anniversary Living History of the Federal Garrison at Harper's Ferry. Id. at 15–17. It is the 1989 Antietam events, however, that are the principal subject of plaintiff's complaint.

### B.

The relevant agency actors at Antietam are these: Richard Rambur is the superintendent of the park. He is responsible for the overall administration of the park and oversees the implementation of the interpretive program. Below him is Ed Mazzer, the chief ranger. The interpretive program is run by Rangers Paul Chiles and Ted Alexander. Chiles has been the interpretive specialist and park historian at Antietam since May 1981. He has a bachelor's degree in U.S. history and has been doing Living History for some twenty years. Alexander is the volunteer coordinator at the park. He has a master's degree in history, and he has authored, co-authored, or edited three books and more than forty articles in that field. He also taught history at the high school level before joining the Park Service. In formulating the specific uniform require-

ments for Antietam, Alexander has done extensive research, including visits to the Museum of the Confederacy and other large collections.

One of the Living History scenarios that Alexander and Chiles devised is the "Aftermath of the Battle," a multi-unit event that calls for thirty-five to forty volunteer participants. The theme is Civil War medicine and treatment of the wounded. In casting the scenario for 1989, Alexander entered into an agreement with the 21st Georgia. See Event Agreement Between Antietam National Battlefield Park and the 21st Georgia for the Aftermath of the Battle, August 19–20, 1989 (introduced as Alexander Depo. ex. 7). The agreement instructed the 21st to provide at least "10 members" to portray wounded Confederate soldiers and prisoners in a field hospital scene with a surgeon and some visiting civilians. Id. The agreement emphasized that Aftermath was not a firing event, and the 21st was not to bring firearms [7]—only props for medical demonstrations. With respect to the civilian roles, the agreement provides that the 21st could have "six *female* members" do the following impressions: "2 local farm women of Unionist sympathies; 2 visiting Northern ladies seeking loved ones in the Army of the Potomac; and 2 ladies of Southern sympathies from Jefferson County, Virginia seeking loved ones in Virginia regiments." Id. (emphasis added).

As for the main incident that gave rise to this suit, the following facts are not in dispute. On the morning of August 19, 1989, the first day of the two day event, Alexander and Chiles held a meeting with the group leaders in the Visitor Center. The leader of the 21st Georgia, David Pridgeon, was not present, apparently not having arrived at the park yet. Alexander considered Pridgeon's absence conspicuous, because the 21st Georgia had a "long history of being a problem unit." Out of twenty-five units enrolled at the park, more than half of the counseling letters had been directed at the 21st Georgia. Indeed, the unit was on probation and in danger of being dropped from the roster

---

[7]. For safety reasons, firing events are subject to far greater regulation and are treated as a distinct category in NPS–6. See NPS–6, *supra*, ch. 4, at 5–6 & app. C.

because of substandard uniforms and other problems.

After the meeting ended at about 10:00, Alexander and Chiles walked out into the lobby of the Visitor Center and over to the information desk to relieve the seasonal ranger manning that post. At that point, several volunteers and rangers pointed out a woman dressed in a Confederate uniform standing outside in the parking lot. Alexander and Chiles looked out the window, turned to each other and said, "That's a woman in uniform, isn't it?" They contend that even from this vantage point, they also could tell that her musician's uniform was not very accurate and did not meet the park's standards. While Chiles took over at the information desk, Alexander headed out to the parking lot to have a talk with the woman.

As it turned out, the woman was Lauren Cook. She told Alexander that she was with the 21st Georgia and that she had come to participate in the Aftermath of the Battle. Alexander claims that he was surprised because of what he considered to be the poor quality of her impression. In particular, he claims that her uniform was not the proper cut, the material was of the wrong weave, and it looked, unrealistically, brand new. Her cap and some of the facings [8] also were questionable, and the way she wore the equipment and the uniform was wrong. With respect to "identifiable physical characteristics," Alexander also thought she was deficient insofar as she appeared to be female. Her hair, her figure, and traces of make-up around her eyes gave her away.[9]

### C.

As for what happened next, there is some conflict between the version of events told by the NPS officials and that told by Ms. Cook and her associates. According to Alexander, he told Cook that her impression was "inappropriate" for the scenario they contemplat-

ed. It did not call for an unwounded musician—much less one who appeared to be female. Cook asked if she could keep wearing the uniform and simply tour the park as a visitor. Alexander says that while he discouraged her from doing so because of the confusion it could engender in the minds of the visitors—and tried to appeal to her esprit de corps by saying that it would reflect poorly on the 21st Georgia—he did not tell her that she could not.

Alexander says he concluded by telling Cook that he would be happy to discuss the matter further with her unit leader when he arrived, and that she could attend the meeting if she desired. Alexander claims that throughout the encounter, he was polite and non-confrontational, and that he repeatedly apologized for any inconvenience to her. Chiles also claims that judging from Alexander's body language, which he saw through the window, Alexander appeared to be acting politely.

About a half hour later, Alexander says that Cook and Burgess approached him outside the visitor's center, loudly protested the perceived violation of her rights, and demanded answers right then and there. Alexander told them that he was not going to air the issue outside in front of other visitors but would convene a meeting with all concerned in the superintendent's office.

Present at that meeting were Alexander, Chiles, Cook, Burgess, Pridgeon, and Rambur. Alexander and Chiles claim that Cook and Burgess were "agitated," "belligerent and sarcastic" as they tried to explain their accuracy policy and the reasons for it. At one point, for example, she allegedly said something like "When did God die and leave you in charge?" She also allegedly proclaimed that she would not abide by their interpretation policy because she considered it too strict.

---

8. Facings are the decorative "trimmings, collar, and cuffs of certain military coats." Webster's New Universal Unabridged Dictionary 655 (2d ed. 1983).

9. Plaintiff suggested in her deposition that she really *had* effectively disguised her gender and *was therefore accurate with respect to that char-*

acteristic. She claims it was a trip to the ladies room that gave her away. This contention never made it into the pleadings or the briefs, however. On the contrary, the briefs all but concede that she appeared to be female in arguing that it is invidious and unconstitutional to require a woman to disguise her gender.

Plaintiff and her associates tell a different story. She claims that in the initial encounter, Alexander told her, "We don't allow that scenario here," and when she asked "What scenario?," he responded, "We don't allow women in uniform here." When asked if he meant that she could not be on NPS property in a uniform because she was a woman, Alexander answered in the affirmative. Moreover, according to plaintiff, Alexander's "tone, attitude, and words" were "beligerent, [sic] rude, and offensive." She would have to either remove the uniform, dress for one of the female roles, or leave the park.[10] She got the impression that he would physically "kick[ ] [her] out of the park if [she] persisted in wearing the uniform."

Plaintiff further asserts that during the meeting held in the superintendent's office, Alexander and Chiles "made it clear" to her that "women were not allowed to portray military roles because they wanted to portray the typical ... [a]nd they classified a woman in a military role, regardless of her impression, as atypical." Burgess and Pridgeon corroborate her story, agreeing that the NPS officials frankly stated that they do not permit women to portray soldiers. Cook and Burgess also claim that while the NPS officials discussed their uniform policies in general, they never cited any deficiencies in Ms.

Cook's uniform and did not phrase their objections to her impression in gender-neutral, accuracy-based terms. They focused exclusively on the fact that she was a female. Alexander said that the presence of a woman in uniform would mislead the public about the composition of Confederate ranks and the role of women in the mid-nineteenth century America. He mentioned their concern about the confusion and inaccurate impressions created in the visitors' minds when "yahoos" who dress up in crude attempts at Civil War uniforms tour the park on days when Living History events are scheduled. Plaintiff considered it an insult to be equated with these "yahoos." After the meeting, Cook and Burgess left Antietam and went to Harper's Ferry for a while. She returned to sleep overnight at the 21st Georgia's encampment, and the next day, she participated in the second day of the Aftermath event in a female civilian role.

### D.

On August 29, 1989, Cook wrote Chief Ranger Ed Mazzer a four and a half page, single-spaced typed letter setting forth her version of events. In the letter, she said that she had consulted lawyers who apparently thought that the reimbursement of certain

**10.** Defendant attempts to create an issue of whether plaintiff was actually excluded from participating in the Aftermath event., arguing that plaintiff admitted that she never intended to participate in the Aftermath event. Since a person cannot be prevented from doing what they never intended to do, their theory goes, she was not really excluded· from the Aftermath event and thus has no standing to sue. Def's Reply Memo. at 3; Memo. Supporting Def's Motion for S.J. at 15 n. 8; Def's Memo. Opposing Pl's Motion for S.J. at 12 & n. 10. In support of this contention, defendant adverts to plaintiff's initial letter of complaint to Chief Ranger Ed Mazzer. Defendant correctly quotes that letter in saying that plaintiff arrived in uniform "with the intention of simply visiting the Park and spending the day there as a member of the public," "perhaps spending the day reading or touring the Park as a visitor." Letter from Lauren Cook to Ed Mazzer at 2 (Aug. 29, 1989) (incorporated by reference into Pl's Resps. to Def's First Set of Interrogs. paras. 15–16) [hereinafter Mazzer Letter]. Defendant fails to mention, however, that in the very same sentence, plaintiff explains that the reason she had this intention was not because she did not want to participate in the Living

History, but because she expected—and as it turned out, rightly so—that she "would not be allowed to participate." Id. The Vice President of the 21st Georgia had informed her that "the Park Service at Antietam d[o] not allow women to re-enact in uniforms." Id. The undisputed facts concerning the meeting make clear that whatever plaintiff intended to do if her expectation proved to be true, she really did want to participate in this event, as she had in so many others.

Defendant contends alternatively that whatever plaintiff wanted to do that day, Alexander did not exclude her from participating in the event. Def's Statement of Material Facts para. 33 (citing Alexander Depo. at 100). Defendant suggests that the only official action taken was the routine one of raising individual deficiencies with the unit commander as part of an overall evaluation, and that a "female Confederate soldier musician" was "inappropriate for a hospital scenario." Alexander Depo. at 100–01. But when pressed at on cross-examination, Alexander admitted that he was not going to let plaintiff participate in the scenario in a military role. Id. at 103. In view of the foregoing, there is no genuine issue as to plaintiff's standing.

volunteer costs brought the VPA program within the ambit of Title VII and threatened to file a complaint with the Equal Employment Opportunity Commission (EEOC). She said that Alexander did not "deserve to wear th[e] uniform" of a park ranger, and demanded that he "compose and send to [her] a detailed letter apologizing" for the "incorrect assertion" that she could not be on Park Service property in uniform, for telling her to take the uniform off or leave the park, and for equating her with the "yahoos." She demanded that the park take "any and all disciplinary action" against Alexander and said that she would be "more than willing to participate and testify" in any proceedings. In conclusion, she said that only "[s]wift action ... to discipline Mr. Alexander [would] convince her" that the Park Service does not permit its rangers to "discriminate against, insult, and bully members of the taxpaying public" with "impunity."

Shortly after this correspondence, there was another incident that plaintiff cites in support of her claim of unconstitutional discrimination in the implementation of NPS–6 at Antietam. Alexander and Chiles had scheduled a "Torchlight Tour" event for September 16, 1989 and entered into an event agreement with the 21st Georgia to participate. The agreement specified that the 21st was to furnish a "Maximum of six female members, 2 to portray local Unionist ladies helping with the wounded, 2 Unionist ladies searching for dead loved ones, and 2 ladies to assist [the] Frederick Ladies Relief Society as assigned." On September 16, plaintiff followed up her letter to Mazzer with a phone call to the park superintendent, Richard Rambur. When she asked if she would be allowed to participate in the Torchlight Tour, she claims that he said that Antietam "made a distinction between military and civilian roles by gender," and that "under no circumstances would [she] be allowed to participate in any Antietam living history event in a military role because of her gender." Rambur flatly denies that he said any such thing.

Several months later, Rambur wrote an admonitory letter to Pridgeon. In the letter, which was dated March 7, 1990, Rambur expressed his concern about "a pattern of less than satisfactory performance," including "things like showing up on the wrong weekend for an event and then not fulfilling your commitment for the scheduled event, showing up several hours late for training, failure to turn paperwork in on time, dirty weapons at inspections and failure to upgrade uniform impression to meet our standards." Letter from Richard Rambur to David Pridgeon (Mar. 7, 1990) (introduced as Alexander Depo. ex. 8). He also cited the August 19, 1989 incident as the one example of a deficiency that happened after Pridgeon became the leader of the group. He noted that the event agreement called for "ten members to portray infantrymen and several of your females to do an impression of local women," but that he had brought "extra personnel ... such as children and one female who wanted to do a fifer impression." Rambur also stated that he "would like to see [the] civilian impression of the women of the 21st improved. Individuals have been noticed manifesting anachronisms such as makeup, improper hairstyles and clothing." Rambur closed by saying that because the 21st "ha[d] the potential to be a good living history group," they would be given "another chance."

### III.

#### A.

Rule 56(c) of the Federal Rules of Civil Procedure commands that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." "Summary judgment is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

It is insufficient, to avoid summary judgment, that some factual disputes remain in the case. An issue must be both genuine and

material to preclude the entry of summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). An issue is genuine if, considering the record as a whole, there is enough evidence to support a rational finding either way. In making this determination, the non-movant's evidence "is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge...." *Id.*[11] *To determine whether an issue is material, the case must be looked at through the prism of the governing substantive law. "Only disputes of facts that might affect the outcome of the suit ... will properly preclude the entry of summary judgment." Id.* at 248, 106 S.Ct. at 2510. It is the "substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Id.* Accordingly, the next inquiry must be into the elements of an equal protection claim and the allocation of the burdens of persuasion and production.

### B.

 The equal protection component of the Due Process Clause of the Fifth Amendment places the same limits on the exercise of federal power that the Equal Protection Clause of the Fourteenth Amendment places on the exercise of state power. *Bolling v. Sharpe*, 347 U.S. 497, 500, 74 S.Ct. 693, 695, 98 L.Ed. 884 (1954); *see also Vance v. Bradley*, 440 U.S. 93, 94 & n. 1, 99 S.Ct. 939, 941 & n. 1, 59 L.Ed.2d 171 (1979). In essence, the guarantee of "equal protection of the laws" requires that similarly situated persons be treated similarly. *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). To the extent that there are meaningful, socially relevant differences between individuals, however, those individuals are not similarly situated for equal protection purposes. Government not only may, but often must classify and treat such individuals differently in order to achieve what it considers to be the just distribution of benefits and burdens in society. *See id.* at 441, 105 S.Ct. at 3255 (construing *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (classifications are valid if based on "distinguishing characteristics relevant to interests the State has the authority to implement")); *see, e.g., Allied Stores v. Bowers*, 358 U.S. 522, 526–27, 79 S.Ct. 437, 440–41, 3 L.Ed.2d 480 (1959) (differential taxation). Indeed, "most laws classify, and many affect certain groups unevenly.... When the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no constitutional concern." *Personnel Admin. of Mass. v. Feeney*, 442 U.S. 256, 271–72, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979) (upholding Massachusetts law that favored veterans over non-veterans notwithstanding a 98% correlation between that characteristic and gender); *see also Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (disparate impact renders a facially-neutral law invalid only if traced to a discriminatory purpose).

 For these reasons, legislative and regulatory classifications enjoy a strong presumption of validity. To rebut this presump-

---

11. It is important to bear in mind that because plaintiff seeks only equitable relief, the Court would be the trier of fact if this case went to trial. This eliminates the special concerns that are associated with removing a case from a jury, and alters the rules of summary judgment accordingly. The Court is not confined to deciding questions of law, but also may, subject to the "clearly erroneous" standard of Fed.R.Civ.P. 52(a), draw a derivative inference from undisputed subsidiary facts, even if those facts could support an inference to the contrary, so long as the inference does not depend upon an evaluation of witness credibility. *Compare In the Matter of Placid Oil Co.*, 932 F.2d 394, 398 (5th Cir.1991) *and Fox v. Johnson & Wimsatt*, 127 F.2d 729, 737 (D.C.Cir.1942) ("Conflict concerning ultimate and decisive conclusion to be drawn from undisputed facts does not prevent rendition of summary judgment, when that conclusion is one to be drawn by the court [anyway if the case went to trial].") *with United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962) (courts cannot choose from among rational inferences that could be drawn from underlying facts where trial would be to a jury). To this limited extent, a non-moving party in a case that would be tried to the court is not, strictly speaking, entitled to the benefit of *all* favorable inferences.

tion, a challenger must demonstrate that the classification does not have any conceivable "rational relationship" to a "legitimate state end." *McDonald v. Board of Election,* 394 U.S. 802, 809, 89 S.Ct. 1404, 1408, 22 L.Ed.2d 739 (1969). This highly deferential standard of review reflects the difference in the respective roles of courts and legislatures in a representative democracy with a constitutional separation of powers. Courts do not sit as super legislatures to judge the wisdom of policy. The constitutional framework gives the elected branches wide latitude to formulate policy, and necessarily tolerates even improvident exercises of that discretion. Mathematical exactitude in the fit between means and ends cannot be expected and is not required. *New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976); *Vance v. Bradley,* 440 U.S. at 97, 108, 99 S.Ct. at 942, 948; *Williamson v. Lee Optical Co.,* 348 U.S. 483, 488–89, 75 S.Ct. 461, 464–65, 99 L.Ed. 563 (1955). Thus, the general rule of judicial review is that a classification will be sustained unless it is based on a distinction between persons that no legislator or executive officer acting rationally and in good faith could have believed made a legitimate difference. *See Vance v. Bradley,*

440 U.S. at 97, 99 S.Ct. at 942; *McGowan v. Maryland,* 366 U.S. 420, 425–26, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961) ("A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.") [12]

■ Some distinguishing characteristics—such as race, alienage, and national origin—"are so seldom relevant to the achievement of any legitimate state interest" that classifications expressly drawn along those lines "are deemed to reflect prejudice and antipathy—a view that those in the burdened class are not as worthy or deserving as others." *Cleburne,* 473 U.S. at 440, 105 S.Ct. at 3254. Because it is, to say the least, far less likely that such classifications are rationally based than it is that they are based on precisely the sort of prejudiced, oppressive, and invidious sentiments that the Civil War amendments forever banished from our law, a classification of this sort is suspect and presumed to be invalid. It is subject to, as variously stated, the most "exacting," "rigid," and "strict" judicial scrutiny. If such scrutiny is invoked, the burden rests heavily on the government to show that the classification is "necessary" to the achievement of a "compel-

**12.** *Compare Schweiker v. Wilson,* 450 U.S. 221, 230, 101 S.Ct. 1074, 1080, 67 L.Ed.2d 186 (1981) (eligibility for public assistance) (upholding discrimination between mental patients in public mental institutions and those in private mental institutions and public medical hospitals); *United States R.R. Retirement Bd. v. Fritz,* 449 U.S. 166, 174–75, 101 S.Ct. 453, 459–60, 66 L.Ed.2d 368 (1980) (eligibility for pension benefits) (upholding discrimination between railroad retirees with a current connection to a railroad or 25 years service and all other railroad retirees); *Vance v. Bradley,* 440 U.S. at 97–98, 99 S.Ct. at 943 (employment) (upholding statute setting mandatory retirement for Foreign Service personnel at age 60 but giving all other federal employees until age 70); *New Orleans v. Dukes,* 427 U.S. at 303, 96 S.Ct. at 2516 (upholding discrimination in the issuance of vending permits between pushcart vendors who had been operating continuously in the French Quarter for at least eight years and those who had not); *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. at 314–16, 96 S.Ct. at 2567–68 (employment) (upholding statute mandating retirement of police officers at age 50); *McDonald,* 394 U.S. at 808–09, 89 S.Ct. at 1408–09 (voting) (upholding discrimination in determining eligibility for absentee balloting between pretrial detainees, who are physically prevented

by judicial order from making it to the polls, and those who are so prevented by medical disability); *McGowan,* 366 U.S. at 425–26, 81 S.Ct. at 1104–05 (finding rational basis for exempting the vendors of certain necessities from Sunday closing law); *Williamson v. Lee Optical Co.,* 348 U.S. at 488–89, 75 S.Ct. at 464–65 (finding rational basis for exempting sellers of ready-to-wear glasses from statute barring opticians from selling glasses without a written prescription) *and Railway Express Agency v. New York,* 336 U.S. 106, 109–10, 69 S.Ct. 463, 465–66, 93 L.Ed. 533 (1949) (finding rational basis for exempting trucks displaying advertisements of their owners' wares from statute barring the use of trucks as advertising platforms) *with Cleburne,* 473 U.S. at 439–42, 447–50, 105 S.Ct. at 3254–55, 3258–60 (finding no rational basis for zoning law requiring special permit for home for mentally retarded but not for other multiple-dwelling and care facilities) *and Allegheny Pittsburgh Coal Co. v. County Com'n,* 488 U.S. 336, 344–46, 109 S.Ct. 633, 638–39, 102 L.Ed.2d 688 (1989) (taxation) (finding no rational basis for real property tax assessment scheme that based property valuation primarily on the price for which property last sold, which resulted in gross valuation disparities between similar properties based solely on how long ago the property last changed hands).

ling state interest," *see In re Griffiths*, 413 U.S. 717, 721–22 & nn. 9–10, 93 S.Ct. 2851, 2854–55 & nn. 9–10, 37 L.Ed.2d 910 (1973) (collecting cases), i.e., that there are no other, more narrowly tailored means to achieve that interest. *See University of California Bd. of Regents v. Bakke*, 438 U.S. 265, 299, 98 S.Ct. 2733, 2753, 57 L.Ed.2d 750 (1978).[13]

■ Classifications based on gender, not unlike those based on race, are also suspect, because gender "generally provides no sensible ground for differential treatment. '[W]hat differentiates sex from such nonsuspect statuses as intelligence or physical disability ... is that the sex characteristic frequently bears no relation to ability to perform or contribute to society.'" *Cleburne*, 473 U.S. at 440–41, 105 S.Ct. at 3254–55 (quoting *Frontiero v. Richardson*, 411 U.S. 677, 686, 93 S.Ct. 1764, 1770, 36 L.Ed.2d 583 (1973) (plurality opinion)). Such classifications are too often based on "archaic and overbroad" generalizations, *Schlesinger v. Ballard*, 419 U.S. 498, 508, 95 S.Ct. 572, 577, 42 L.Ed.2d 610 (1975), or "stereotypic notions" concerning the roles of men and women in society. *Frontiero*, 411 U.S. at 684–85, 688–89 & n. 23, 93 S.Ct. at 1769–70, 1771–72

& n. 23 (generalization that most wives are dependent on husbands but not vice versa); *see also Weinberger v. Wiesenfeld*, 420 U.S. 636, 643, 95 S.Ct. 1225, 1231, 43 L.Ed.2d 514 (1975) (similar generalization about the financial status of women); *see also Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724–26, 102 S.Ct. 3331, 3336–37, 73 L.Ed.2d 1090 (1982) (stereotypical conception of nursing as a female occupation).

■ Because they are so likely to be irrational, gender classifications, like racial classifications, are presumed invalid. But because gender is a potentially more meaningful difference between individuals than skin color is, gender classifications are somewhat more likely to be rationally based. Accordingly, they are subject to an intermediate level of scrutiny—one that is "heightened" but not "strict." A gender classification can be sustained only if the government makes "an exceedingly persuasive" showing that the classification is "substantially related" to the achievement of "important governmental objectives," *Craig v. Boren*, 429 U.S. 190, 197, 97 S.Ct. 451, 457, 50 L.Ed.2d 397 (1976), and that it is not really based on stereotypical notions.[14]

---

**13.** *Compare Palmore v. Sidoti*, 466 U.S. 429, 432–33, 104 S.Ct. 1879, 1881–82, 80 L.Ed.2d 421 (1984) (invalidating judicial determination to award custody to father solely because white mother was co-habitating with a black man, thus potentially exposing the child to private prejudice contrary to her best interest); *Loving v. Virginia*, 388 U.S. 1, 11, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967) (invalidating miscegenation statute); *McLaughlin v. Florida*, 379 U.S. 184, 196, 85 S.Ct. 283, 290, 13 L.Ed.2d 222 (1964) (invalidating imposition of different criminal penalties for adultery and fornication based on the race of the offenders) *and Brown v. Board of Educ.*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (invalidating racial segregation in public schools) *with Lee v. Washington*, 390 U.S. 333, 334, 88 S.Ct. 994, 995, 19 L.Ed.2d 1212 (1968) (Black, Harlan, and Stewart, JJ., concurring) (upholding temporary racial segregation of prison to quell race riot) *and Korematsu v. United States*, 323 U.S. 214, 217–18, 220–21, 65 S.Ct. 193, 194–95, 195–96, 89 L.Ed. 194 (1944) (upholding national-origin-based segregation of Japanese–Americans in a wartime context).

**14.** *Compare Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451 (invalidating statute setting different drinking age for men and women); *Mississippi Univ. for Women*, 458 U.S. at 724, 731, 102 S.Ct. at 3336, 3340 (invalidating statute barring men

from state nursing school); *Frontiero*, 411 U.S. at 690–91, 93 S.Ct. at 1772–73 (invalidating statute giving only male members of Armed Forces the right to claim their spouse as dependents for purposes of obtaining more generous benefits and allowances); *Reed v. Reed*, 404 U.S. 71, 76–77, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971) (invalidating statute directing courts, in appointing person to administer a decedent's estate, to choose a male over female as between two otherwise equally qualified candidates); *Orr v. Orr*, 440 U.S. 268, 278–83, 99 S.Ct. 1102, 1111–14, 59 L.Ed.2d 306 (1979) (invalidating statute providing that only husbands could be required to pay alimony after divorce) *and Weinberger v. Wiesenfeld*, 420 U.S. at 652–53, 95 S.Ct. at 1235–36 (invalidating provision giving Social Security survivor benefits to widows but not widowers) *with Rostker v. Goldberg*, 453 U.S. 57, 78–79, 101 S.Ct. 2646, 2658–59, 69 L.Ed.2d 478 (1981) (upholding statute requiring only men to register for the draft) *and Michael M. v. Superior Court*, 450 U.S. 464, 471–73, 101 S.Ct. 1200, 1205–06, 67 L.Ed.2d 437 (1981) (upholding statutory rape law that applied only to men on the ground that men and women are not similarly situated with respect to the consequences of sexual intercourse); *Schlesinger v. Ballard*, 419 U.S. at 508–09, 95 S.Ct. at 577–78 (upholding statute giving women naval personnel longer than their male

## C.

The rigors of strict or heightened scrutiny are only appropriate, however, once purposeful discrimination on the basis of an inherently suspect characteristic such as race or gender is established. *Estate of Jacquelyn Scott v. DeLeon,* 603 F.Supp. 1328, 1332 (E.D.Mich.1985). In cases where a law or regulation makes an explicit reference to a suspect characteristic, purposeful discrimination is self-evident, and the measure is subject to challenge on its face without any evidentiary inquiry into the motives of the relevant government actors. *See Jackson v. Thornburgh,* 907 F.2d 194, 196–97 (D.C.Cir. 1990). Both the VPA and NPS–6 are gender-neutral, and plaintiff does not challenge their validity. It is the manner in which the officials at Antietam administer the program that she attacks. Nevertheless, plaintiff argues strenuously for the application of heightened scrutiny to the official action at issue.

At first blush, plaintiff's reliance on *Craig v. Boren* and its progeny seems misplaced. Where the claim is that facial neutrality masks an invidiously discriminatory purpose on the part of the drafters of the regulation, or, as here, that the regulation is "applied and administered by public authority with an evil eye and an unequal hand," *Yick Wo v. Hopkins,* 118 U.S. 356, 373–74, 6 S.Ct. 1064, 1073, 30 L.Ed. 220 (1886), an entirely different, essentially evidentiary analysis is typically applied. This analysis is governed by principles developed in *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), *Mount Healthy City Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), *Feeney, supra,* and *Washington v. Davis, supra.* Further analysis compels the conclusion, however, that heightened scrutiny is indeed appropriate in this case.

There are three layers of policy, in descending order of specificity, that comprise the law of interpretive functions at NPS-administered areas: The VPA, which is silent on the question of accuracy and thus gives the agency discretion to fill in this statutory gap, *see Chevron v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); NPS–6, which adopts historical accuracy as a criterion of discrimination, subject to certain limitations, but vests park administrators with discretion to fill in the remaining gaps; and finally, the detailed implementary policies of each park. Much of this lowest layer of policy is very informal. But it does assume written form to some extent. For example, Antietam officials have written detailed uniform and appearance requirements based on the specific history of their park. They draft agreements to cast the events and write follow-up letters evaluating group performance and indicating any improvements that have to be made. These writings must be seen as giving a "face" to the policy at issue in this case for purposes of determining whether purposeful discrimination can be conclusively presumed.

Where a plaintiff mounts an equal protection challenge to the implementation of a statutory-regulatory scheme by agency officials in the field, it is appropriate for the courts to accord conclusive effect to written embodiments of the implementary policy that contain explicit references to a suspect characteristic and draw classifications based thereon—just as such references on the face of a statute or regulation create a conclusive presumption of purposeful discrimination in challenges to a statutory or regulatory policy. Discriminatory intent is equally self-evident both situations. There is simply no principled basis for distinguishing between the two. The rationale underlying the presumptions of heightened scrutiny is that a written, gender-based classification renders a policy so much more likely to be unconstitutional that an unfavorable rule of decision and allocation of the burden of persuasion is warranted—as a matter of efficient judicial administration as well as justice. This rationale applies with equal force to this case. The question becomes, then, whether

counterparts to achieve mandatory "up or out" promotion on the ground that women, who face severe limitations the acquisition of seafaring experience, are not similarly situated with men with respect to promotion through naval ranks).

the event agreements and counseling letter adduced in this case are gender-neutral on their face.

### (a) The Aftermath of the Battle Event Agreement

Alexander entered into an agreement with David Pridgeon, the commander of the 21st Georgia, to cast the Aftermath of the Battle event scheduled for August 19–20, 1989. The agreement called for a minimum of "10 members" to portray wounded Confederate soldiers and prisoners in a field hospital scene with a surgeon and some visiting civilians. *Id.* If desired, the 21st Georgia also could do some civilian impressions. They could have "six *female* members" portray "2 local farm women of Unionist sympathies; 2 visiting Northern ladies seeking loved ones in the Army of the Potomac; and 2 ladies of Southern sympathies from Jefferson County, Virginia seeking loved ones in Virginia regiments." *Id.* (emphasis added).

### (b) The Torchlight Tour Event Agreement

Shortly after the Aftermath event and the Cook incident, Alexander and Pridgeon entered into an agreement to cast the Torchlight Tour, which was to be held on September 16, 1989. *See* Torchlight Tour Event Agreement (introduced as Alexander Depo. ex. 9). The agreement specified that the Park needed a "minimum of 15 members of the group to portray wounded and dead soldiers." *Id.* Like the Aftermath agreement, this agreement went on to permit some civilian impressions—a "[m]aximum of 6 *female* members, 2 to portray local Unionist ladies helping with the wounded," etc. *Id.* (emphasis added).

Because the "female members" language refers to the gender of the *participant* rather than the gender of the *character* to be portrayed, it amounts to a gender-based classification with respect to the casting of civilian roles. The meaning of this language is plain not only in the weak sense that other possible interpretations are less plausible. It is plain in the strong sense that there *are* no other possible interpretations. Alexander has conceded as much. When given the opportunity to offer a different interpretation, he could not come up with one, saying only

that the agreements were "poor[ly] word[ed]." *See* Alexander Depo. at 85.

While the agreements *arguably* are ambiguous on the question of whether there was also a gender-based classification for military roles, one suspect classification is enough to trigger heightened scrutiny. Moreover, the counseling letter that Rambur sent to Pridgeon on March 7, 1990 clearly reveals that the Antietam administration interpreted the agreements as creating a gender-based classification for military roles as well.

### (c) The Counseling Letter

In the letter, Rambur described "a pattern of less than satisfactory performance," including "things like showing up on the wrong weekend for an event and then not fulfilling your commitment for the scheduled event, showing up several hours late for training, failure to turn paperwork in on time, dirty weapons at inspections and failure to upgrade uniform impression to meet our standards." Rambur specifically pointed to the August 19, 1989 incident as his one example of deficient performance under Pridgeon's watch. Rambur said that while the event agreement called for "ten members to portray infantrymen and *several of your females* to do an impression of local women," he had brought "extra personnel . . . such as children and *one female* who wanted to do a fifer impression." (Emphasis added). Rambur said that while the 21st had potential and would not be dropped from the roster as yet, they were on probation.

Rambur's repeated references to the gender of the participant rather than the character role to be played reveals that his understanding of the language in the event agreements is consonant with their plain meaning. Even without this evidence of Rambur's subjective intent, the Court would still feel compelled to hold that the agreements create gender-based classifications for military as well as civilian roles. In this circuit, the interpretation of contracts is considered an issue of law, not fact, and thus cannot preclude summary judgment. *Pennsylvania Avenue Development Corp. v. One Parcel of Land,* 670 F.2d 289, 292 (D.C.Cir. 1981); *see Antilles S.S. Co. v. American Hull*

*Ins. Syndicate,* 733 F.2d 195, 203–07 (2d Cir.1984) (Newman, J., concurring) (collecting cases). Though the meaning of contracts is based on the parties' intent, it is the objective manifestations of that intent, strictly construed against the drafter, that are determinative—notwithstanding parol evidence of an alternate, subjectively intended meaning.

In light of the foregoing, the Court holds that the policy under attack is facially non-neutral. This raises a conclusive presumption of purposeful discrimination and a rebuttable presumption that this discrimination is unconstitutional. Defendant rested entirely on its categorical denial of purposeful discrimination and made no alternative argument that such discrimination would pass muster under *Craig v. Boren.* Had defendant made such an argument, the outcome of this case might well have been different. Whatever one might think of the wisdom of gender-based discrimination in casting Living History, it is not necessarily invidious or unconstitutional. The fit between the *end* of assuring that participants appear accurate with respect to the "identifiable physical characteristic" of gender, and the *means* of classifying roles according to gender, may be sufficiently tight to pass constitutional muster. If, for example, the overwhelming number of persons, male or female, who tried to disguise their gender for dramatic roles in Living History events could not do so effectively, gender would be a very close proxy for an important aspect of historical accuracy—namely, the respective roles of men and women in society. Though courts must be on their guard for justifications based on stereotypical notions, that would not appear to be the case here. A desire to portray history faithfully—in a way that reflects the respective roles of men and women in at a particular stage of social development—is not itself a product of the archaic and stereotypical notions upon which those roles were based. "The history of discrimination against women in the military is not on trial in this case." *Feeney,* 442 U.S. at 278, 99 S.Ct. at 2295.

The Court notes in passing that the agency charged with implementing Title VII of the Civil Rights Act of 1964, 42 U.S.C. sec. 2000e *et seq.,* which is in many ways more strict than the Equal Protection Clause and its Fifth Amendment counterpart, provides that discrimination on the basis of a suspect characteristic is not invidious if "necessary for the purpose of authenticity or genuineness ... e.g., an actor or actress." Equal Employment Opportunity Comm'n Guidelines, 29 C.F.R. sec. 1604.2(a)(2) (1992). But the Court need not pursue this inquiry further. The government having failed utterly to meet its burden of rebutting the presumption of invalidity that the documentary evidence raised, plaintiff is entitled to judgment as a matter of law under *Craig v. Boren.* Moreover, as the following analysis demonstrates, plaintiff is entitled to judgment under an *Arlington Heights* analysis as well.

## IV.

### A.

■ The constitutional rule that emerges from *Arlington Heights, Mount Healthy, Feeney,* and *Washington v. Davis* is that a government official does not violate equal protection if: (1) No matter how severe the disparate impact, the official in fact was not motivated by presumptively impermissible sentiments; or (2) the official was partly motivated by presumptively impermissible sentiments, but the same decision would have been reached for neutral reasons by a decisionmaker who harbored no such sentiments.

■ There is some subtlety, however, in the way the burden of proof is allocated in a purposeful discrimination case. At the outset, the official action enjoys a presumption of validity, and plaintiff bears the burden of production as well as persuasion. But plaintiff does not have to make the ambitious claim that the official action was motivated "solely" by impermissible considerations, or even that such was the "dominant" or "primary" motivation. Indeed, to meet her initial burden of production, plaintiff need not even show that "but for" the presumptively impermissible sentiment, a different decision would have been reached—even though that is the ultimate constitutional test. Plaintiff only has to show that the decision was "moti-

vated *in part* by [an invidiously] discriminatory purpose." *Arlington Heights*, 429 U.S. at 270 n. 21, 97 S.Ct. at 271 n. 21 (emphasis added); *see also id.* at 266–67, 97 S.Ct. at 563–65.

■ If plaintiff carries this burden, the presumption of validity is vitiated, a presumption of invalidity arises, and the burden shifts to the government to demonstrate that "the same decision would have resulted even had the impermissible purpose not been considered." *Mount Healthy*, 429 U.S. at 285–87, 97 S.Ct. at 575–76; *Arlington Heights*, 429 U.S. at 270 n. 21, 97 S.Ct. at 566 n. 21; *cf. Texas Dep't of Community Affairs. v. Burdine*, 450 U.S. 248, 252–56, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981) (discussing burden shifting in Title VII cases). If the government does nothing, or cannot rebut the presumption by a preponderance of the evidence, plaintiff wins without having to confront the more difficult task of showing that presumptively impermissible considerations were a "but for" cause of the decision.

■ In evaluating a claim of purposeful discrimination, the Court must engage in a "sensitive inquiry" into whatever "circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266, 97 S.Ct. at 564. But plaintiff must be able to point to something that is inconsistent with a completely neutral explanation for the official's decision or that otherwise evinces presumptively impermissible sentiments—

here, that women cannot portray male soldiers regardless of the quality of their impression. This is because in proving subjective motivation, objective conduct that is "as consistent with [a] permissible" motivation "does not, standing alone, support an inference" of unconstitutional discrimination. *See Matsushita*, 475 U.S. at 588, 106 S.Ct. at 1356 (conspiratorial motivation). There must be something more than equipoise to meet the burden of production, overcome the presumption of good faith, and shift the burden of proof to the government. To survive defendant's motion for summary judgment, plaintiff "must show that the inference" of gender-based discrimination "is reasonable in light of the competing inferences" of discrimination for neutral reasons—in this case, historical accuracy. *See id.*[15] In *Arlington Heights*, the Supreme Court set forth a nonexhaustive list of indicia that an official action was motivated by presumptively impermissible considerations. "The impact of the official action—whether it 'bears more heavily on one race [or sex] than another'—may provide an important starting point. Sometimes a clear pattern, unexplainable on grounds other than race [or gender] emerges . . . even when the [law] appears neutral on its face." *Id.* (citation omitted); *e.g., Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); *Yick Wo*, 118 U.S. 356, 6 S.Ct. 1064.[16] But where the pattern is less stark, or where there are plausible neutral reasons to account for it, "impact alone is not

---

**15.** Claims such as those involved in this case, which under an *Arlington Heights* analysis turn on the defendant's state of mind, often require an evaluation of witness credibility. *See* Advisory Committee on Rules, Note to 1963 Amendment of Federal R.Civ.P. 56, subdiv. (e), para. 6 (summary judgment inappropriate where material fact "cannot be resolved without observation of the demeanor of witnesses"). For many years, courts viewed summary judgment with disfavor and granted it more "sparingly" in state-of-mind cases. *See Poller v. CBS, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (conspiratorial state of mind). This was so despite the fact that the language of the Rule itself draws no distinction between different types of cases and that summary judgment—far from being disfavored in the law—advances the Rules' central policy of a just, swift, and inexpensive judicial resolution of disputes. *See Celotex Corp. v. Catrett*, 477 U.S. at 327, 106 S.Ct. at 2555. Whatever merit there may be to the argument that courts should be

predisposed against granting summary judgment in certain types of cases, the Supreme Court has clearly rejected that view. *See Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514. Therefore, in embarking upon the analysis of the evidence in this case, the Court will consider the evidence of defendant's state of mind as it would any other evidence, without any predisposition against summary judgment.

**16.** The mere fact that the distinguishing characteristic correlates highly with gender or race does not automatically invalidate the statute. Because equal protection "guarantees equal laws, not equal results," *Feeney*, 442 U.S. at 273, 99 S.Ct. at 2293, the disparate impact must be traced to a discriminatory purpose, *Washington v. Davis*, 426 U.S. at 239, 242, 96 S.Ct. at 2047, 2049, for that is "the condition that offends the Constitution." *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971).

determinative" and cannot, by itself, support an inference of presumptively impermissible motivation. *Arlington Heights*, 429 U.S. at 266, 97 S.Ct. at 564; *see, e.g., Feeney*, 442 U.S. 256, 99 S.Ct. 2282 (upholding civil service preference for veterans despite the fact that 98% of the beneficiaries were male); *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040 (upholding police entrance examination in spite of substantially higher failure rate for racial minorities). The court therefore must turn to other evidence.

[ (1) ] The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes.... [ (2) ] The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes.... [ (3) ] Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. [ (4) ] Substantive departures too may be relevant, particularly if the factors usually considered important ... strongly favor a [contrary] decision.... [ (5) ] the legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports. In some extraordinary instances the members might be called to the stand to testify concerning the purpose of the official action....

*Id.* at 267–68, 96 S.Ct. at 564–65 (citations omitted).

██ The Court will begin with the documentary evidence of discriminatory intent adduced in this case, which fits under the fifth, "contemporary statements" rubric. The Court will then proceed to analyze the evidence bearing on the remaining factors enumerated in *Arlington Heights*, and conclude with a consideration of other relevant evidence.

### B.

#### (1) *Documentary Evidence of the Considerations Upon Which the Agency Action Was Based*

In addition to establishing constructive purposeful discrimination under *Craig v.* *Boren*, the event agreements and counseling letter, discussed *supra* Section II–C, constitute compelling evidence of actual purposeful discrimination. They clearly reflect a gender-conscious state of mind on the part of Alexander, Chiles, and Rambur. This evidence is so overwhelming that it might well, by itself, entitle plaintiff to judgment as a matter of law under the *Arlington Heights* analysis, because it makes the remaining factual issue of whether the agency actors actually uttered what plaintiff alleges they uttered fade into immateriality. *See* 6 James W. Moore et al., Moore's Federal Practice, pt. 2, para. 56.15[4], at 56–268 (1992) (credibility determinations unnecessary where summary judgment "utilizes the effect of a legal presumption upon established facts; or is based ... upon documentary evidence, or upon the opposing party's admissions"); *e.g., White Motor Co. v. United States*, 372 U.S. 253, 259, 83 S.Ct. 696, 700, 9 L.Ed.2d 738 (1963) (antitrust conspiracy) (some areas of law are so well developed that "where, as here, the gist of the case turns on documentary evidence," the actual intent and motives of the actors lose their materiality); *Associated Press v. United States*, 326 U.S. 1, 11–12, 65 S.Ct. 1416, 1420, 89 L.Ed. 2013 (1945) (same) (by-laws of defendant association were "in and of themselves contracts in restraint of trade," rendering unnecessary any other inquiry into the state of mind of the alleged conspirators); *SEC v. Geyser Minerals Corp.*, 452 F.2d 876, 879–81 (10th Cir. 1971) ("documentary materials submitted" held "sufficient to sustain judgment as a matter of law" regardless of dispute over whether defendant in fact made certain oral representations); *United States v. Beatrice Foods Co.*, 344 F.Supp. 104, 108 (D.Minn. 1972) (summary judgment against defendant appropriate where there was no dispute over the contents of certain documents, only over their legal characterization and effect), *aff'd*, 493 F.2d 1259 (8th Cir.1974), *cert. denied*, 420 U.S. 961, 95 S.Ct. 1350, 43 L.Ed.2d 438 (1975).

#### (2) *Disparate Impact*

In this case, plaintiff has adduced no statistical evidence of the relative impact of

NPS–6 on men and women, either service-wide or at Antietam. This distinguishes this case from *Arlington Heights, Yick Wo, Feeney,* and *Washington v. Davis.* Since the object of the challenge is not the governing statute or regulation, a service-wide disparate impact analysis is not relevant. With respect to Antietam, the Court is left to speculate on the extent of the disparity in the impact of the park policy as between men and women. Plaintiff attempted to gather the statistics, but the Park Service keeps none. *See* Def's Resps. to Pl's First Set of Interrogs. no. 6. While the historical scenarios at the park obviously are male-intensive, there are a number of roles for female characters that men presumably do not fill. There is even one event at Antietam dedicated to the history of women disguised as men in the Civil War. Moreover, there is no way to know whether, assuming that no other women have ever portrayed soldiers at Antietam events—and that it was therefore akin to a "traditionally segregated job-category"—it would not be the result of official policy, but the fact that "because of long-standing social attitudes" and the difficulty of proper costuming, portraying Civil War soldiers "has not been regarded *by women themselves* as desirable work." *Johnson v. Transportation Agency,* 480 U.S. 616, 668, 107 S.Ct. 1442, 1470, 94 L.Ed.2d 615 (1987) (Scalia, J., dissenting) (emphasis in original). Plaintiff has not shown that anyone other than she has ever been excluded—much less that there is a pool of qualified female applicants by which to measure the disparity of impact.

All of this is not to suggest that a plaintiff must present disparate impact evidence to prevail in a purposeful discrimination case, or even that a "consistent pattern" of discrimination is "a necessary predicate" to make out an equal protection violation. *Arlington Heights,* 429 U.S. at 266 n. 14, 97 S.Ct. at 564 n. 14. "A single invidiously discriminatory governmental act" is enough. *Id.* It is simply that in the absence of such statistics, the Court is missing what could be rather telling evidence, and must move on to consider the other factors enumerated in *Arlington Heights.*

### (3) *Historical Background*

■ Plaintiff repeatedly alludes to the complaint that Patricia Ann Lammers filed in 1982 under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* alleging discriminatory employment practices in the staffing of black powder firing demonstrations at Antietam. *See* Pl's Statement of Undisputed Facts no. 19, at 5; Pl's Consol. Reply Memo. at 10–11. It is true that the Lammers litigation is part of the historical background which, had the parties not settled the case, might have provided some evidence of past gender discrimination at Antietam that might be relevant under an *Arlington Heights* analysis. *See* Def's Resps. to Pl's First Set of Interrogs. para. 12, at 11–12; United States Dep't of the Interior, Settlement Agreement, CPA No. 82–07–173 (1983). But the settlement agreement contains no admission of discrimination, and surely no rational inference concerning the meritoriousness of a claim can be drawn from the mere filing of a complaint, or from the fact that the Department of the Interior agreed to settle the case. The agency may well have been "motivated by a desire for peace rather than … weakness of position." Advisory Committee on Proposed Rules, Note to Proposed Federal Rule of Evidence Rule 408, para. 1. Moreover, compromise and settlement is favored in the law, particularly in civil rights cases. *Sears v. Atchison, Topeka & Santa Fe Ry.,* 749 F.2d 1451, 1454 (10th Cir.1984), *cert. denied sub nom. United Transp. Union v. Sears,* 471 U.S. 1099, 105 S.Ct. 2322, 85 L.Ed.2d 840 (1985). It ought not to be discouraged by using the fact of settlement as evidence of past discrimination in a subsequent action.

It is for very sound reasons then that Federal Rule of Evidence 408 precludes the Court from considering the Lammers litigation as evidence of a pattern or practice of discrimination, or even allowing it to color the court's view of the *relevant* evidence. Furthermore, as discussed in subsection (5) below, the anti-disparate impact provisos that the Lammers litigation gave rise to have limited relevance in this case. They speak to the rights of employees, whose careers and livelihood are at stake, and simply do not

apply to the purely avocational volunteer program.[17] The rights of volunteers under the VPA are protected by the Constitution, not NPS-6 and Title VII.

### (4) *Procedural Irregularities*

It is undisputed that there are also some irregularities in this case which, if unexplained, would constitute a "[d]eparture[ ] from the normal procedural sequence" within the meaning of *Arlington Heights,* 429 U.S. at 267–68, 97 S.Ct. at 564. Alexander has stated that, for reasons of administrative convenience, he and Chiles have a policy of dealing only with unit commanders and never approaching individual volunteers to discuss perceived deficiencies in their impressions. *See* Alexander Depo. at 42. If they spot such deficiencies at an event, they might raise the matter with the unit commander as one factor in an overall review of that unit's performance after the event is over. Adverse action, if any, is taken against the unit and on the basis of its performance over the course of many events. *Id.* at 41, 44. Alexander could not cite a single instance where Antietam officials so much as approached an individual—much less excluded him or her from participation in an event—because of a deficiency in their impression. *Id.* at 43–44, 94–95, 100; Def's Resps. to Pl's First Set of Interrogs. para. 20, at 19.

This evidence suggests a focus on particularized, individual accuracy with respect to gender, but overall, unit accuracy with respect to other identifiable physical characteristics such as weight and age. But this arouses suspicion only if the reason that Chiles and Alexander approached plaintiff in the first place was because she was a "woman in uniform." The impetus behind the initial approach is thus a material fact. Alexander said in his deposition of November 19, 1991 that he was prompted to approach plaintiff for a reason totally unrelated to impression quality and that he was quite unaware of her gender at the time he set off for the parking lot. He explained:

> [I]t was brought to my attention by a number of volunteers and Park seasonal [sic] rangers that there was a reenacter [sic] with a weapon in the visitor center ... area. This immediately caused me to believe that this was probably not one of our volunteers because it is generally known that volunteers do not bring weapons into the visitor center area. And ... this was a medical weekend ... [but] the scenario did not call for weapons.... So my first assumption that this was a visiting reenactor [since] we occasionally have people that like to dress up and visit the Park in some sort of Civil War outfit and tour around, which is fine, however, they are asked to take their weapons, whether it is a bayonet and/or rifle and put it in their car, preferably lock it up in their trunk....

Alexander Depo. at 88–89. It was only after he met plaintiff that he discovered that she was not a re-enactor, but a member of a volunteer unit and noticed that her impression was deficient. Even then, his immediate impulse was to find the unit leader, as called for by standard operating procedure. *See id.; see also id.* at 100–01. As the above quoted statement implies, approaching supposed freelance re-enactors for weapons violations was routine. Indeed, it was not unprecedented to approach known volunteers for health and safety reasons and then call any observed deficiencies in their impression to the attention of the unit leader. Alexander recalled that he once had to prohibit an elderly individual from participating because of extreme summer heat and subsequently raised the matter of his atypical age with the unit leader as part of an overall evaluation. *See id.* at 44.

This passage of Alexander's deposition cannot be viewed in isolation. In assessing whether there is "substantial evidence" to support an inference, the record as a whole must be considered, *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356, and the effect of evidence that tends to preclude that inference taken into account. *Cf. Universal Camera Corp. v. NLRB,* 340 U.S. 474, 487–88, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951) (history that prompted the APA's abandonment of "scintilla" review in favor of less deferential

---

**17.** *See infra* note 21.

whole-record review).[18] Neither Alexander nor Chiles mentioned anything about a firearm in their March 1991 memoranda to Richard Rambur. Yet these memoranda not only purport to set forth a comprehensive version of events: They address the precise subject of the impetus behind the approach. This makes the silence concerning the firearm deafening. *See* Memorandum from Ted Alexander to Richard Rambur (Mar. 7, 1991) (introduced as Alexander Depo. ex. 14); Memorandum from Paul Chiles to Richard Rambur (Mar. 20, 1991) (introduced as Chiles Depo. ex. 1). Both Alexander and Chiles wrote in no uncertain terms that the reason that Alexander approached plaintiff was because she was a "woman in uniform." The inconsistency between this and Alexander's deposition statements on the subject is plain and rises to the level of self-contradiction. *See* 3A John Henry Wigmore, Evidence in Trials at Common Law sec. 1040 (James H. Chadbourn rev. ed. 1970) (in assessing consistency, courts must consider the "whole impression or effect" of the statements).[19]

It is well-settled that "[a] party may not create a *genuine* issue of fact by contradicting his own earlier statements, at least without a plausible explanation for the sudden change of heart." *Richardson v. Bonds,* 860 F.2d 1427, 1433 (7th Cir.1988) (emphasis in original); *accord Pyramid Secs. Ltd. v. IB Resolution, Inc.,* 924 F.2d 1114, 1123 (D.C.Cir.) (collecting cases from second, third, fourth, sixth, ninth, eleventh, and District of Columbia circuits), *cert. denied,* —— U.S. ——, 112 S.Ct. 85, 116 L.Ed.2d 57 (1991); *Camfield Tires, Inc. v. Michelin Tire Corp.,* 719 F.2d 1361, 1364 (8th Cir.1983). While it is not the function of the court on summary judgment to weigh evidence or determine credibility issues between different witnesses or parties, *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513, the rejection of statements that are implausible and contrary to other statements made *by the same person* is "not a credibility determination but rather [the] recognition of a sham issue." *Camfield Tires,* 719 F.2d at 1365; *cf.* Fed.R.Civ.P. 56(f) (giving the district courts discretion to strike sham affidavits and impose sanctions).[20] Resolving testimonial inconsistencies between different witnesses is far different from acknowledging, in considering the record as a whole, the effect of a prior self-contradiction on the substantiality of a subsequent denial. Chiles' and Alexander's latter-day explanation that the reason why Alexander approached plaintiff was because she had

**18.** *See also* Steven Allen Childress & Martha S. Davis, Standards of Review sec. 3.3 (1986) (noting that most circuits have adopted whole-record review for jury verdicts).

**19.** Lending further support to the overall impression created by the Chiles memo—that Alexander approached plaintiff because she was a woman— Chiles deploys elaborate statistics in what appears to be not a factual denial of gender-based discrimination at Antietam, but an affirmative, justificatory argument. These statistics purport to show that the fraction of women who actually fought in the Civil War by disguising their gender and passing as men was so infinitesimal that a gender-based exclusion from military roles would be a nearly exact proxy for an important aspect of accuracy. *See* Memorandum from Paul Chiles to Richard Rambur, *supra,* at 2. This suggests that Chiles had in mind an idea of gender in fact rather than appearance. The Court observes that an exclusion policy based on gender in fact rather than appearance might not even pass the rational basis test. Accuracy is not an end in itself. The governmental objective here is assuring that an accurate impression is created in the minds of the public. Thus, there is no *accuracy* reason not to allow an effectively disguised impressionist to participate in Living History, since by hypothesis, the inaccuracy would be undetectable by the public. Since all the women who fought in the Civil War passed as men, and since effectively disguised female impressionists would have to as well, the actual gender of the impressionist is irrelevant to the governmental objective here.

The only rational basis for a gender-based exclusion policy would be the administrative convenience of obviating individualized accuracy determinations in volunteer approval. Whether this rational basis could survive heightened scrutiny, however, is an open question. *See, e.g., Michael M. v. Superior Court,* 450 U.S. at 473–75, 101 S.Ct. at 1206–07; *Orr v. Orr,* 440 U.S. at 280–82, 99 S.Ct. at 1112–13; *Craig v. Boren,* 429 U.S. at 204, 97 S.Ct. at 460.

**20.** Of course, the earlier statements here were unsworn, which distinguishes this case somewhat from those cited above. They do amount to party admissions. *See* Fed.R.Evid. 801(d)(2); *infra* Section VI–B–(1). If a party's statements against his own interest are so inherently trustworthy that they are admissible at trial whether sworn or not, then they trustworthy enough to be held up against subsequent sworn statements for our purposes here.

a firearm, not because she was "a woman in uniform," does not raise a genuine issue.[21]

### (5) *Substantive Departures*

#### (a)

Plaintiff expended considerable energy trying to prove that Antietam policy was contrary to the agency's own regulations. Because plaintiff's complaint does not sound in administrative law, she need not make the ambitious claim that the Antietam officials' interpretation of NPS-6 was so unreasonable that they could be characterized as arbitrary, capricious, and an abuse of discretion. For purposes of the Court's "sensitive inquiry" under *Arlington Heights*, the agency interpretation need only appear to be inconsistent with a permissible interpretation of the regulation in a way that adversely affects plaintiff or otherwise suggests that gender-based considerations influenced the official actions. It is with this in mind that the Court will consider the evidence on this issue.

It is undisputed that Alexander, Chiles, and Rambur—according to their interpretation of NPS-6—thought that the anti-disparate impact provisos added as part of the settlement of the Lammers suit applied not just to NPS employees like Lammers, but also to volunteers participating in Living History events under the VPA. *See, e.g.,* Alexander Depo. 31–32; Rambur Aff. para. 7; Def's Statement of Mat. Facts para. 20.[22] These provisos state:

> The selection of *personnel* for presentations must not abridge *employee* rights or opportunities for *job* experience in which they have a *career interest* and qualifications. We must be concerned with the accuracy of the information the interpreter presents and how effectively it is presented, not with the individual's race, ethnic background, or sex.

NPS-6, *supra,* ch. 4, at 4 (emphasis added).

> In general, [Living History] should be used only for very special situations. When planning, be sure that the decision to utilize first person does not *result* in *unintentional* discrimination in *hiring, training, promotions,* opportunities, etc.

*Id.* (emphasis added)

Current employment and equal rights laws, attitudes, and respect for the intelli-

---

21. Bolstering the Court's conclusion is the recognition that an inference of incredibility here does *not require demeanor evidence*. The subsidiary facts that Alexander had two stories, and that one was offered closer in time to the events in question, before extensive consultations with attorneys, and against self-interest, permit the derivative inference of incredibility as to the subsequent explanation. *See, e.g., Richardson v. Bonds,* 860 F.2d at 1433. Since this Court would be the trier of fact if this case went to trial, it make little sense for the Court not to draw this inference on summary judgment just because, against the backdrop of a jury trial, the Court could not select one rational inference over another. *See supra* note 10.

22. Actually, Alexander's and Rambur's interpretation of the provisos is invalid as a matter of administrative law, because it is contrary to the plain meaning of the language as well as its purpose and drafting history. By its terms, NPS-6 applies only to park service "employees." NPS-6, *supra,* ch. 4, at 3. It does not mention volunteers, and the ordinary meaning of the word "employee" would not include uncompensated individuals with purely avocational interests who are, in any event, more like independent contractors than employees. Even if the Court felt constrained to defer to an official agency interpretation of the word "employee" to include volunteers "hired" under event "contracts" if that word is taken in isolation, it could not do so in this case. The purpose of the provision is apparent on its very face and confirms that the ordinary meaning of the word employee was intended. That purpose is to protect the "career" interests of Park Service personnel. This reference to "career" advancement limits the range of permissible interpretations of the word "employee," and thus, precludes the broad construction suggested above.

While the Court need go no further than the language of the provision itself where its meaning is plain, it is worth noting that an examination of the policy and history behind the text also confirms this interpretation. First, a Park Service employee's career is obviously of greater weight than a volunteer's avocational interest in participating in programs under Park Service auspices. As a matter of policy, in which individual interests are balanced against the public interest in historical authenticity, there is a rational basis for treating employees differently from volunteers. Second, this provision was added to NPS-6 pursuant to the settlement of a lawsuit by a Park Service employee alleging a violation of Title VII concerning the staffing of black powder demonstrations. Since the question under an *Arlington Heights* analysis is Alexander's state of mind, it does not matter that he was laboring under a misinterpretation of NPS-6.

gence of our visitors dictate that the selection ... criteria for the presentation of interpretive programs should not reach the point of intruding upon the rights or opportunities of our *employees* for *job experiences* for which they have a *career interest* and qualifications.

Nat'l Park Serv., Living History Guidelines Clarification at 1–2 (circulated June 10, 1983) (introduced as Alexander Depo. ex. 6).

These provisos are a significant qualification of the accuracy requirements of NPS-6. In essence, they provide that if achieving accuracy in a given situation results in a disparate impact along racial or gender lines, even if it is unintentional, then it must yield. If Alexander thought that these provisos applied to the volunteers, then his use of explicit gender-based classifications rather than gender-neutral accuracy requirements in the event agreements, constitutes a substantive departure from agency policy *as he understood it*—one that has an adverse impact on plaintiff in a way that is related to gender. Alexander's repeated insistence on accuracy regardless of impact, and his exclusion of plaintiff from participation in the Aftermath event, also amount to substantive departures.

### (b)

Plaintiff stresses that NPS-6 specifically limits the number of Living History events relative to the other types of interpretive presentations allegedly because Living History tends to result in the greatest disparate impact. *See* NPS-6, *supra*, ch. 4, at 4. She alleges that Antietam officials hold more Living History events than NPS-6 permits, and that this too is a substantive departure. Even if the officials had exceeded their considerable discretion as a matter of administrative law, this argument contributes nothing to plaintiff's wholly constitutional claim. It would be relevant only if she alleged that the NPS officials held too many Living History events *because of*, and not merely in spite of, the putative adverse impact on women. Not only has plaintiff failed to make this allegation, the theory that officials who specifically intend to discriminate against women would do so in the rather unwieldy manner of sponsoring an excess of Living History events is "implausible" and "simply makes no

... sense." *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. The existence vel non of a substantive departure on this point is immaterial.

### (6) *Other Evidence*

The main factual dispute in the case concerns the events of August 19, 1989 and the telephone conversation between Cook and Rambur. There is conflicting testimony about what the parties said and how they said it that goes to the central issue of the officials' state of mind. According to plaintiff, when Alexander spoke with her outside of the visitor center, he said that " 'We don't allow women in uniforms here,' " and when asked "if he meant that [she] could not be on park property in a uniform *because* [she was] a woman," Mazzer Letter, *supra*, at 2 (emphasis added); *accord* Cook Depo. at 23. Plaintiff also avers that "Alexander's tone, attitude, and words to me during this exchange were beligerent [sic] rude and offensive." Mazzer Letter, *supra*, at 2.

At the meeting held later that day to discuss the matter, plaintiff claims that Alexander and Chiles stated that their reason for excluding her was that "women [are] not allowed to play military roles," because while there may have been three or four disguised female combatants at Antietam, "it was not the norm and they wanted to portray the typical and not the atypical." Cook Depo. 23. According to plaintiff, Alexander and Chiles did not cite any deficiencies in her uniform, the effectiveness of her disguise as a male, or the appropriateness of a fifer impression in a hospital scene. *Id.* at 23–24.

In addition to this, plaintiff avers that when she telephoned Rambur for a clarification of what the Park Service intended by the language in the Torchlight Tour event agreement, he said something to the effect that in implementing NPS-6, Antietam officials "made a distinction between military and civilian roles by gender," and that "under no circumstances would [she] be allowed to participate ... in a military role because of [her] gender." Cook Aff. at 3; Pl's Resps. to Def's First Set of Interrogs. at 15.

Defendant tells quite a different story. Alexander, Chiles, and Rambur flatly deny ever

having said that the reason for their objections to plaintiff's playing a military role was because of her gender. Rather, they contend that their objections were based on the gender-neutral ground that her impression of a Civil War soldier lacked historical accuracy in several "identifiable physical characteristics." First, unlike the three or four females who are believed to have fought at the battle of Antietam, she did not effectively disguise her gender. She was inauthentic not because she was female, but because she appeared to be female. Her hair, her figure, and traces of make-up around her eyes gave her away. Besides, plaintiff's uniform was seriously deficient. It was "spanking new," it was incorrectly tailored, and the material was of an inauthentic weave. *See* Def's Reply. Memo. at 3. Her cap and some of the facings were doubtful, and the way she wore the equipment and the uniform was not correct. Even if the uniform were correct, the hospital scene that Alexander and Chiles envisioned did not call for the role that plaintiff was dressed up to play, namely, an unwounded "soldier/musician." · As for the telephone conversation between plaintiff and Rambur, the Superintendent denies ever saying that women are not permitted to play military roles. And all of the rangers deny that they exhibited any hostility toward plaintiff from which antipathy might be inferred. On the contrary, they insist that they were polite and professional, and that if anyone was hostile, it was plaintiff and her associates.

Absent other evidence, this testimonial dispute over the official's state of mind would be material to the central issue of whether the officials were motivated by presumptively impermissible considerations. But there is no genuine issue in this case that there was an unexplained procedural irregularity, a substantive departure from policy, and most important, clear documentary evidence of discriminatory intent. This compelling circumstantial evidence renders immaterial the concededly genuine issue of what was said in the parties' various encounters and conversations. It simply does not matter whether the

agency officials *orally* revealed a discriminatory state of mind, as plaintiff avers, since their deeds and writings constitute sufficient grounds to hold, as a matter of law, that they were at least motivated in part by gender-based considerations.

## V.

Having concluded that the plaintiff established a prima facie case as a matter of law, the next task is to determine whether defendant has met its burden of going forward with evidence that could support a non-"clearly erroneous" finding [23] that even if discriminatory sentiments were a motivating factor, the same result would have been reached for gender-neutral reasons by NPS officials without a discriminatory bone in their bodies.

Defendant argues that plaintiff's impression was subpar in several non-gender-related respects and that this provides ample neutral grounds for approaching plaintiff and excluding her from participation in the Aftermath event. Giving the government the benefit of all favorable inferences on this point, a trier of fact rationally could find that plaintiff's impression was deficient. But all this proves is that a gender-neutral official *could* have approached and excluded plaintiff on accuracy grounds under NPS-6. The material question is whether plaintiff *would* have been approached and excluded. The government bears the burden of proof on this, and yet has put forward no evidence that could support an inference that approaching individual volunteers and excluding them from participation in Living History events was sufficiently typical that a trier of fact rationally could conclude that, more likely than not, plaintiff would have suffered the same fate at the hands of the average NPS officials involved in interpretive programs.

First, it is undisputed that Antietam has a firm policy of not approaching or excluding individual volunteers for impression deficiencies.[24] Alexander and Chiles could not cite a

---

23. *See supra* note 10.

24. Indeed, defendant concedes that they tolerate the fact that their volunteers units are older and heavier than Civil War units. Defendant at-

tempts to distinguish the case of a volunteer who is inaccurate in apparent gender from those who are heavier or taller than the average Civil War soldier, arguing that as individuals, these volun-

single instance of exception to this policy. Surely in the long history of these events at Antietam, comprising thousands of volunteers, some individuals that Alexander and Chiles came across were as deficient as plaintiff is alleged to have been. Defendant concedes that Antietam has perhaps the strictest accuracy policy in the NPS system. Indeed, defendant offers this as an explanation of why plaintiff was allowed to portray a male soldier at several other parks. So, even if the relevant pool of NPS officials by which the typicality of the official actions in this case is to be judged comprises the strictest officials in the business, there is no basis for inferring that plaintiff would have been excluded anyway. And if the relevant pool is more broadly defined as all NPS officials involved in Living History, the undisputed fact that plaintiff has participated in numerous Living History events at other parks whose administrators, for whatever reason, did not exclude her suggests with equal force that "but for" Alexander's uniquely zealous attitude toward the gender inaccuracy, plaintiff probably never would have been approached, the meeting never held, and so on.

In short, the evidence in this case is so "one-sided," *Anderson,* 477 U.S. at 251–52, 106 S.Ct. at 2512, that plaintiff is entitled to summary judgment, with respect to her Antietam claims, under an *Arlington Heights* analysis as well as under *Craig v. Boren.*

### VI.

In addition to her allegations concerning Antietam, plaintiff alleges that NPS officials at Gettysburg, Harper's Ferry, and Appomattox also bar women from portraying male soldiers in Living History events. The Court observes that plaintiff not only had more than a year for discovery, but was also the party that moved for summary judgment first. In these circumstances, the failure to submit any admissible evidence to support these claims is difficult to comprehend. The Court declines to consider, in support of

plaintiff's motion, such evidence as was produced. Plaintiff's motion for summary judgment is, accordingly, denied as to those issues. While it does not necessarily follow that the cross motion should be granted, *see* 6 Moore's Federal Practice, pt. 1, para. 56.13, at 56–177, the Court has decided, for the reasons that follow, that defendant's motion should be granted with respect to all of the non-Antietam claims.

### A.

A trial court's power to rule on the admissibility of evidence for purposes of Rule 56 is co-extensive with its power to rule on the admissibility of evidence at trial. *See Yoder v. Nutrena Mills, Inc.,* 294 F.2d 505, 512 (8th Cir.1961); *see also Gauck v. Meleski,* 346 F.2d 433, 436 (5th Cir.1965). But trial admissibility is not always a prerequisite for considering evidence on summary judgment. In judging whether a movant has met its burden of establishing that there are no genuine issues of material fact, the Court has discretion to consider inadmissible evidence if the non-movant does not object. *See Catrett v. Johns–Manville Sales Corp.,* 826 F.2d 33, 37 (D.C.Cir.1987), *cert. denied,* 484 U.S. 1066, 108 S.Ct. 1028, 98 L.Ed.2d 992 (1988); *United States v. Dibble,* 429 F.2d 598, 603 (9th Cir.1970) (Wright, J., concurring). In contrast, in judging whether a *non-movant* has produced enough *to avoid* summary judgment, the Court must consider the evidence they submitted—even if it would be inadmissible at trial in the form submitted—so long as it could be reduced to an admissible form for trial. *See Kyriakopoulos v. George Washington Univ.,* 866 F.2d 438, 446 (D.C.Cir.1989) (Starr, J.) (citing *Celotex Catrett,* 477 U.S. at 324, 106 S.Ct. at 2553); *see also J.F. Feeser, Inc. v. Serv–A–Portion, Inc.,* 909 F.2d 1524, 1542 (3d Cir.1990) (same), *cert. denied,* —— U.S. ——, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991). This can be seen as a function of the Court's duty to look at the non-movant's case in its "most favor-

---

teers were all within the range of actual weights and heights, and thus, none was inaccurate. This focus on individual accuracy is inconsistent with defendant's repeated assertions that the policy at Antietam was to deal with units, and to appraise their performance, on a collective rath-

er than individual basis. Had defendant argued that a gender inaccuracy is more significant than the others because it bears on a very important feature of history, that might have been a persuasive ground for distinction.

**26**

able light." *Adickes v. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

■ It is only where a non-movant has produced no evidence that could be reduced to an admissible form—after ample time for discovery and after being put on notice, by the movant's briefs, of its failure of proof—that the court must enter summary judgment against the non-movant under *Celotex. See* 477 U.S. at 322–26, 106 S.Ct. at 2552–54 (rejecting this aspect of the dissent below, otherwise adopted, *Catrett v. Johns–Manville Sales Corp.*, 756 F.2d 181, 191 & n. 10 (D.C.Cir.1985) (Bork, J., dissenting)). Each factual issue plaintiff attempted to raise will be analyzed in turn.

## B.

### (1)

■ First, David Pridgeon avers in his affidavit that a ranger at Harper's Ferry told him "over the phone that women would be excluded from military roles" in the October 20, 1989 event at Harper's Ferry. Pridgeon Aff. para. 5; *see also* Pl's Resps. to Def's First Set of Interrogs. at 16. However, Pridgeon was unsure of the ranger's name, and plaintiff did not submit any telephone records. Defendant summarily dismisses this evidence as "rank hearsay," which the Court takes as a general objection to Pridgeon's evidence. *See* Def's Reply Memo. at 4. The Court rejects defendant's contention that the averments contained in Paragraph 5 of the Pridgeon Affidavit are inadmissible hearsay but concludes that because plaintiff failed to show a reasonable possibility that the call could be authenticated, and thus reduced to an admissible form, she failed to meet her burden of production under *Celotex.*

As for the hearsay charge, the Court observes that the statements were "offered against" plaintiff's party-opponent, the Secretary of the Interior, and were made by Park Service officials, who are his "agent[s] or servant[s]." Fed.R.Evid. 801(d)(2)(D). The statements "concern[ed] a matter within the scope of [the] agency or employment"— namely, deciding who is permitted to participate in living history presentations—and were "made during the existence of the relationship." *Id.* Therefore, the statements are "not hearsay" under Rule 801(d), even if offered to prove the truth of the matter asserted.[25] Moreover, even if the statements were inadmissible hearsay, it is possible that they could be reduced to an admissible form. *See J.F. Feeser*, 909 F.2d at 1542 (non-movant could rely on inadmissible hearsay in affidavit for purposes of surviving opponent's motion if the movant fails to show that the declarant could not be produced to testify at trial).

The problem with the telephone conversation is not that it violates the hearsay rule, but that the call was not properly authenticated. Pridgeon did not indicate whether he called the ranger or the ranger called him. *See* Fed.R.Evid. 901(b)(6) (authentication requirement met with a showing that declarant placed the call to the number assigned to the business in question and the conversation related to business reasonably transacted over the phone). Nor did Pridgeon indicate whether he had spoken before with the person and, thus, could identify his voice. *See United States v. Pool*, 660 F.2d 547, 560 (5th Cir.1981) (self-identification by a caller is insufficient unless the person receiving the call had heard the caller's voice before and could recognize it). If, after a year of discovery, Pridgeon could not even aver who the ranger was, he cannot reasonably be expected to secure his testimony or adequately authenticate the statements as party admissions. The Harper's Ferry evidence, therefore, must be stricken for all purposes.

25. *See* Advisory Committee on Proposed Rules, Note to subdiv. (d)(2)(D) of Rule 801 (stating that it was "[d]issatisfaction with th[e] loss of valuable evidence" that prompted the Committee to *opt for the more liberal rule, which permits not* only statements that an agent is authorized to make, but also "statements related to a matter within the scope of the agency or employment."); *cf. United States v. AT & T*, 498 F.Supp. 353, 356–58 (D.D.C.1980) (Greene, J.) (officials from various executive agencies deemed agents of party-opponent, the United States, for purposes of Rule 801(d)(2)(D)).

### (2)

The next items plaintiff offered to support her non-Antietam allegations are Pridgeon's averments that two individuals, Chuck Hillsman and David Seay, informed him about park rules excluding women from military roles at Gettysburg and Appomattox. Defendant denies that they were authorized to speak for the NPS. Plaintiff has failed to offer *any* evidence, admissible or otherwise, linking the individuals to the Park Service. To defeat a properly supported motion, nonmovant "may not rest upon the mere allegations or denials" but must set forth "by affidavits or . . . otherwise . . . must set forth specific facts showing that there is a genuine issue for trial." *See* Fed.R.Civ.P. 56(e). Because plaintiff did not provide any evidence of a link between these individuals and the Park Service, she did not meet her burden of production and failed to raise a genuine issue. *Celotex,* 477 U.S. at 322–26, 106 S.Ct. at 2552–54 (plaintiff failed to introduce any evidence tending to show a that *defendant's* asbestos caused the decedent's disease).

### (3)

The third piece of evidence in support of plaintiff's non-Antietam allegations is a letter written by a group called Napoleonic Tactics, Inc., concerning the joint event held at Sayler's Creek State Park and Appomattox Court House National Historical Park (NHP) in 1989. The letter states that "no women . . . will be allowed in the camps as participants." Pl's Ex. 19. Defendant avers that the document was not "produced, authorized, or supported by the National Park Service." Def's Resps. to Pl's First Set of Interrogs. para. 28. Plaintiff has adduced no evidence to the contrary, and for the same reasons stated at (2) above, has not raised a genuine issue for trial.

### (4)

Finally, plaintiff put forward a letter appears to have been written by the Sayler's Creek Committee, a private group that helps the Park Service organize the Sayler's Creek and Appomattox event. The letter begins with the salutation "Dear *Fellow* Re-enactors" and purports to set forth the "Rules and Regulations" governing the portion of the event held at Appomattox NHP. (Emphasis added). Among these is the injunction that "Ladies and children will not be allowed to participate," and "[p]articipants must be male[s] at least sixteen years of age." Again, defendant avers that the provisions referred to were not "imposed, approved, or supported by the NPS," Def's Resps. to Pl's First Set of Interrogs. para. 26, and plaintiff has adduced no evidence to the contrary. Indeed, the letter from Napoleonic Tactics that plaintiff herself submitted indicates that Superintendent Rambur publicly disclaimed, well before the institution of this litigation, that there was any "relationship between the NPS program and the Saylor's Creek [sic] Committee." [26]

As to plaintiff's own statements concerning the non-Antietam claims, they are either based on what Pridgeon or others told her and thus, are either double hearsay or are not based on personal knowledge as required by Fed.R.Civ.P. 56(e). *See, e.g.,* Pl's Resps. to Def's First Set of Interrogs. at 15–17; Cook Depo. at 42–43, 47–48, 49–50.

## VII.

### CONCLUSION

The Court shall, by separate order this date, issue a declaratory judgment that the policy of categorically barring women from portraying male soldiers in Living History events in force at Antietam National Battlefield Park constitutes unconstitutional discrimination against women. Defendant Secretary, and his agents, Superintendent Richard Rambur, Rangers Theodore Alexander and Paul Chiles, and all other Antietam officials and their successors, shall be enjoined from forbidding, hindering, or discouraging individuals from participating in Living History events at Antietam because of their gender. In particular, the above-named officials shall be enjoined from retaliating in any

---

**26.** He did this in order to put to rest an "early account and persistent rumor" that the Sayler's Creek Committee had the authority to approve volunteer groups on behalf of the Park Service and make clear that those who wanted to participate in the Appomattox portion of the event had to secure independent NPS approval. Pl's Ex. 19.

way against the 21st Georgia Volunteer Infantry because of this lawsuit and shall be ordered to permit plaintiff to play appropriate military roles in Living History events at Antietam. Furthermore, the above-named officials shall not be permitted to exclude or even approach individuals for accuracy reasons if even one of the claimed inaccuracies allegedly results from the individual's failure to effectively disguise his or her gender and the officials are not similarly treating individuals with non-gender-related inaccuracies.

Plaintiff's failure to establish the unconstitutionality of the casting policies at any other Park Service facilities renders inappropriate any broader injunction. The Secretary of the Interior may wish to consider, however, amending NPS–6 either to expressly forbid the use of suspect characteristics such as gender as a ground for discrimination in casting, or specify the circumstances in which such discrimination is permissible accompanied by a detailed justification for such a practice under *Craig v. Boren*, 429 U.S. 190, 197, 97 S.Ct. 451, 456, 50 L.Ed.2d 397 (1976).

Plaintiff's request that the court order the Secretary to reprimand the subordinate officials in this case is DENIED as an internal disciplinary matter best left to the Executive Branch for resolution at this time. The court has fulfilled its role by declaring the conduct unlawful and enjoining it. The court notes, however, that the Secretary's actions regarding possible amendments to NPS–6 might impact in future cases on the court's view of its own role in deterring unconstitutional conduct.

Final judgment shall be entered for plaintiff, on the Antietam claims. Final judgment shall be entered for defendant on the non-Antietam claims.

Plaintiff's application for attorney's fees and costs shall be made pursuant to Local Rule 214.

A separate order shall issue.

## ORDER AND FINAL JUDGMENT

Upon consideration of plaintiff's and defendant's cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56 and the local rules of this Court, and the materials submitted in support thereof; and

Having concluded that there is no genuine issue of material fact, and that plaintiff is entitled to judgment as a matter of law with respect to her Antietam claims, plaintiff's motion for summary judgment is hereby GRANTED in part and DENIED in part. Defendant's motion for summary judgment is GRANTED in part and DENIED in part.

The Court hereby DECLARES that the policy of categorically barring women from portraying male soldiers in Living History events in force at Antietam National Battlefield Park constitutes unconstitutional discrimination against women. Defendant Secretary, and his agents, Superintendent Richard Rambur, Rangers Theodore Alexander and Paul Chiles, and all other Antietam officials and their successors, are hereby ENJOINED from forbidding, hindering, or discouraging individuals from participating in Living History events at Antietam because of their gender. In particular, the above-named officials are enjoined from retaliating in any way against the 21st Georgia Volunteer Infantry because of this lawsuit and are ordered to permit plaintiff to play appropriate military roles in Living History events at Antietam. Furthermore, the above-named officials are forbidden to exclude or even approach individuals for accuracy reasons if even one of the claimed inaccuracies allegedly results from the individual's failure to effectively disguise his or her gender and the officials are not similarly treating individuals with non-gender-related inaccuracies.

Plaintiff's failure to establish the unconstitutionality of the casting policies at any other Park Service facilities renders inappropriate any broader injunction.

Final Judgment is hereby entered for plaintiff on the Antietam claims in accordance with the foregoing. Final Judgment is hereby entered for defendant on the non-Antietam claims, which are hereby DISMISSED.

Plaintiff's application for attorney's fees and costs shall be made pursuant to Local

Rule 214. A status conference shall be held in 60 days.

SO ORDERED.

## ERRATA AND ORDER

In the Order and Final Judgment this court entered on March 17, 1993, the court mistakenly stated that plaintiff's application for attorney's fees and costs should be made pursuant to Local Rule 214. The appropriate Local Rule is 215. Accordingly it is hereby ORDERED that:

1. Plaintiff shall apply for attorney's fees pursuant to Local Rule 215 not 214.

2. Pursuant to Local Rule 215, the court shall hold a status conference in this case on May 14, 1993 at 9:30 a.m.

SO ORDERED.